**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TARUNA ROY, derivatively on behalf of COREWEAVE, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL INTRATOR, NITIN AGRAWAL, BRANNIN MCBEE, KAREN BOONE, JACK COGEN, GLENN HUTCHINS, BRIAN VENTURO, and MARGARET WHITMAN,<br><br>Defendants,<br><br>and<br><br>COREWEAVE, INC.,<br><br>Nominal Defendant. | Case No.: 2:26-cv-01345<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Taruna Roy ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant CoreWeave, Inc. ("CoreWeave" or the "Company"), files this Verified Shareholder Derivative Complaint against Michael Intrator ("Intrator"), Nitin Agrawal ("Agrawal"), Brannin McBee ("McBee"), Karen Boone ("Boone"), Jack Cogen ("Cogen"), Glenn Hutchins ("Hutchins"), Brian Venturo ("Venturo"), and Margaret Whitman ("Whitman") (collectively, the "Individual Defendants," and together with CoreWeave, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of CoreWeave, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and against Defendants Intrator, Agrawal, and McBee for contribution under Sections 10(b) and 21D of the Securities Exchange Act (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff

alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CoreWeave, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by CoreWeave's directors and officers from March 28, 2025 through December 15, 2025, inclusive (the "Relevant Period").

2. CoreWeave is a technology company that provides large data centers with infrastructure, proprietary software, and cloud services used to power Artificial Intelligence ("AI") solutions. CoreWeave purportedly sets itself apart from its competitors by utilizing customer relationships to provide its services at a large scale.

3. CoreWeave typically enters into long-term contracts with data center customers to install and manage its proprietary infrastructure and software services through the CoreWeave Cloud Platform. Once CoreWeave enters into a contract with a customer, it will proceed to purchase infrastructure components and install systems required to run the CoreWeave Cloud Platform. Once the infrastructure is installed, CoreWeave will begin to recognize revenues from the customer.

4. On March 10, 2025, the Company issued a press release titled "CoreWeave

Announced Agreement with OpenAI to Deliver AI Infrastructure" (the "OpenAI Announcement Press Release"). The OpenAI Announcement Press Release announced that CoreWeave had entered into an agreement with OpenAI ("OpenAI") for the Company to provide its services in OpenAI data centers. The OpenAI Announcement Press Release also stated that the contract between CoreWeave and OpenAI was worth up to $11.9 billion.

5. On March 28, 2025, the Company conducted its Initial Public Offering ("IPO"), selling 37.5 million shares of common stock priced at $40.00 per share, and raising $1.5 billion for the Company.

6. Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements pertaining to the ability of the Company to meet its customer demand. For example, during an earnings call held on May 14, 2025 (the "1Q 2025 Earnings Call"), in response to investor inquiries regarding CoreWeave's ability to build enough infrastructure to meet demand, Defendant Intrator stated:

> With regards to the revenue beat, ***what you are seeing is a concerted strategic effort by the company to pull in the investment in the infrastructure to be able to build and scale and deliver compute more quickly to the client contracts that we have. And so, we've really made the focus on speed of delivery and quality of delivery to be a primary focus for the company.*** And that beat was really attributed to our ability to drive that motion within our build delivery system.[1]

7. The next day, the Company filed a Quarterly Report on Form 10-Q with the SEC reporting its financial results for the first quarter of 2025 (the "1Q 2025 Form 10-Q"). The 1Q 2025 Form 10-Q continued to tout CoreWeave's ability to build enough infrastructure to meet demand, stating:

> Revenue for the three months ended March 31, 2025 increased by $793 million, or 420%, compared to the three months ended March 31, 2024. This substantial growth was related to increased demand from both existing and new customer

[1] All emphasis has been added unless otherwise stated.

> contracts and our ability to rapidly scale our operations, emphasizing the strength of our customer relationships and our ability to meet the evolving needs of the industry.

8. On July 7, 2025, the Company issued a press release titled "CoreWeave to Acquire Core Scientific" (the "Core Scientific Acquisition Press Release"). The Core Scientific Acquisition Press Release announced that the Company had entered into an agreement to acquire Core Scientific, Inc. ("Core Scientific"). The Core Scientific Acquisition Press Release highlighted the synergies between the companies, with a quote from Defendant Intrator as stating:

> Verticalizing the ownership of Core Scientific's high-performance data center infrastructure enables CoreWeave to significantly enhance operating efficiency and de-risk our future expansion, solidifying our growth trajectory. Owning this foundational layer of our platform will enhance our performance and expertise as we continue helping customers unleash AI's full potential.

9. The truth began to emerge on October 30, 2025, when, during market hours, Core Scientific announced that the acquisition by CoreWeave had not received the shareholder votes required to approve the merger agreement and that, as a result, Core Scientific had terminated the merger agreement.

10. On this news, the price of the Company's stock fell $8.87 per share, or approximately 6.3%, from a closing price of $139.93 per share on October 29, 2025, to close at $131.06 per share on October 30, 2025.

11. The truth continued to emerge on November 10, 2025, when the Company issued a press release reporting disappointing financial results for the third quarter of 2025. On an earnings call held the same day (the "3Q 2025 Earnings Call"), the Company announced it had lowered guidance for revenue, operating income, capital spending, and active power capacity for 2025. However, in an attempt to ease investors' concerns, Defendant Intrator emphasized that the Company was experiencing issues with only "one data center," stating:

> There was a problem at one data center that's impacting us. But there are 32 data centers in our portfolio, all of them are progressing to one extent or another. And so that is -- each one of those is independent. . . . This one data center will catch up and then we will move forward from there.

12. On this news, the price of the Company's stock fell $17.22 per share, or approximately 16.3%, from a closing price of $105.61 per share on November 10, 2025, to close at $88.30 per share on November 11, 2025.

13. The truth fully emerged on December 15, 2025, when the Wall Street Journal issued a report titled "CoreWeave's Staggering Fall From Market Grace Highlights AI Bubble Fears" (the "Wall Street Journal Report"). The Wall Street Journal Report revealed that the OpenAI data center which was to have the CoreWeave Cloud Platform installed had been "pushed back several months." The Wall Street Journal Report further revealed that Core Scientific had "flagged weather-related delays in August." Additionally, the Wall Street Journal Report revealed that Core Scientific had been flagging additional delays to the Company since "at least February."

14. On this news, the price of the Company's stock fell $2.85 per share, or approximately 3.4%, from a closing price of $72.35 per share on December 15, 2025, to close at $69.50 per share on December 16, 2025.

15. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was having difficulties meeting demand as a result of weather and design-related headwinds; (2) CoreWeave was overly reliant on a single third-party data center supplier in order to meet customer demand; and (3) as a result of the difficulties meeting customer demand, it was

unlikely that the Company would meet guidance provided to investors. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

16. Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while four of the Individual Defendants engaged in improper insider sales, netting total proceeds of ***approximately $381.3 million***.

17. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its Chief Development Officer ("CDO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

18. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of

Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

24. Plaintiff is a current shareholder of CoreWeave. Plaintiff has continuously held CoreWeave common stock at all relevant times.

### Nominal Defendant CoreWeave

25. CoreWeave is a Delaware corporation with principal executive offices at 290 W Mt. Pleasant Ave., Suite 4100, Livingston, NJ 07039. CoreWeave's common stock trades on the Nasdaq Stock Market LLC ("Nasdaq") under the symbol "CRWV."

**Defendant Intrator**

26. Defendant Intrator co-founded the Company and has served as its CEO and President and as Chairman of the Board since September 2017.

27. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Intrator made the following sales of Company common stock:

| **Date** | **Number of Shares** | **Avg. Price/Share ($)** | **Proceeds ($)** |
|---|---|---|---|
| June 30, 2025 | 77,258 | $159.99 | $12,260,507 |
| August 27, 2025 | 3,905 | $93.20 | $363,954 |
| August 27, 2025 | 3,703 | $94.13 | $348,563 |
| August 27, 2025 | 6,729 | $95.33 | $641,448 |
| August 27, 2025 | 10,148 | $96.30 | 977,253 |
| August 27, 2025 | 7,970 | $97.00 | 773,088 |
| August 27, 2025 | 6,017 | $93.20 | $560,797 |
| August 27, 2025 | 5,704 | $94.13 | $536,918 |
| August 27, 2025 | 10,367 | $95.33 | $988,245 |
| August 27, 2025 | 15,632 | $96.30 | $1,505,363 |
| August 27, 2025 | 12,280 | $97.00 | $1,191,158 |
| September 10, 2025 | 394 | $110.11 | $43,382 |
| September 10, 2025 | 39 | $111.80 | $4,360 |
| September 10, 2025 | 39 | $112.80 | $4,399 |
| September 10, 2025 | 1,211 | $114.82 | $140,192 |
| September 10, 2025 | 4,234 | $115.79 | $490,251 |
| September 10, 2025 | 3,703 | $116.71 | $432,167 |
| September 10, 2025 | 3,661 | $5,956 | $707,788 |
| September 10, 2025 | 5,956 | $118.84 | $928,199 |
| September 10, 2025 | 7,763 | $119.57 | $475,364 |
| September 10, 2025 | 3,943 | $120.56 | $115,592 |
| September 10, 2025 | 951 | $121.55 | $115,592 |
| September 10, 2025 | 315 | $123.09 | $115,592 |
| September 10, 2025 | 236 | $124.24 | $29,322 |
| September 24, 2025 | 197 | $124.85 | $24,595 |
| September 24, 2025 | 1,428 | $126.44 | $180,558 |
| September 24, 2025 | 2,958 | $127.40 | $376,856 |
| September 24, 2025 | 4,563 | $128.36 | $585,717 |
| September 24, 2025 | 4,987 | $129.42 | $645,438 |
| September 24, 2025 | 5,314 | $130.27 | $692,251 |
| September 24, 2025 | 6,215 | $131.53 | $817,458 |

| | | | |
|---|---|---|---|
| September 24, 2025 | 4,212 | $132.30 | $557,243 |
| September 24, 2025 | 2,491 | $133.28 | $332,012 |
| September 30, 2025 | 78,548 | $139.44 | $10,952,733 |
| October 7, 2025 | 2,300 | $127.23 | $292,623 |
| October 7, 2025 | 4,020 | $128.23 | $515,467 |
| October 7, 2025 | 24,917 | $129.27 | $3,221,118 |
| October 7, 2025 | 9,114 | $130.16 | $1,186,262 |
| October 7, 2025 | 1,100 | $131.33 | $144,459 |
| October 7, 2025 | 1,600 | $132.14 | $211,419 |
| October 7, 2025 | 700 | $133.31 | $93,320 |
| October 7, 2025 | 700 | $134.32 | $94,025 |
| October 7, 2025 | 3,411 | $135.52 | $462,251 |
| October 7, 2025 | 7,428 | $136.36 | $1,020,278 |
| October 7, 2025 | 5,427 | $137.45 | $745,943 |
| October 7, 2025 | 1,009 | $138.11 | $139,353 |
| October 8, 2025 | 1,417 | $132.09 | $187,166 |
| October 8, 2025 | 3,350 | $133.05 | $445,714 |
| October 8, 2025 | 2,468 | $133.99 | $330,698 |
| October 8, 2025 | 3,564 | $135.96 | $484,556 |
| October 8, 2025 | 5,824 | $135.96 | $791,822 |
| October 8, 2025 | 1,149 | $137.07 | $157,497 |
| October 8, 2025 | 4,834 | $138.10 | $667,556 |
| October 8, 2025 | 3,034 | $139.12 | $422,0834 |
| October 8, 2025 | 6,658 | $139.88 | $931,302 |
| October 8, 2025 | 157 | $140.62 | $22,077 |
| October 22, 2025 | 5,411 | $115.24 | $623,569 |
| October 22, 2025 | 5,700 | $115.93 | $660,793 |
| October 22, 2025 | 3,921 | $117.97 | $462,551 |
| October 22, 2025 | 2,828 | $117.97 | $333,612 |
| October 22, 2025 | 2,600 | $119.09 | $309,638 |
| October 22, 2025 | 1,500 | $120.52 | $180,778 |
| October 22, 2025 | 6,095 | $121.55 | $740,863 |
| October 22, 2025 | 3,100 | $122.30 | $379,139 |
| October 22, 2025 | 1,000 | $123.16 | $123,163 |
| October 22, 2025 | 300 | $124.10 | $37,229 |
| November 5, 2025 | 10,214 | $122.73 | $1,253,517 |
| November 5, 2025 | 10,142 | $133.65 | $1,355,447 |
| November 5, 2025 | 7,476 | $114.59 | $856,692 |
| November 5, 2025 | 1,647 | $115.54 | $190,295 |
| November 5, 2025 | 2,268 | $116.71 | $264,704 |
| November 5, 2025 | 472 | $117.28 | $55,357 |
| November 5, 2025 | 236 | $118.30 | $27,919 |
| November 19, 2025 | 7,203 | $73.58 | $530,008 |
| November 19, 2025 | 14,923 | $74.55 | $1,112,565 |
| November 19, 2025 | 7,220 | $75.48 | $544,960 |

| | | | |
|---|---|---|---|
| November 19, 2025 | 2,912 | $76.22 | $221,943 |
| November 19, 2025 | 197 | $77.05 | $15,178 |
| December 3, 2025 | 2,790 | $74.17 | $206,936 |
| December 3, 2025 | 2,685 | $75.05 | $201,518 |
| December 3, 2025 | 8,199 | $76.00 | $623,117 |
| December 3, 2025 | 7,066 | $77.05 | $544,423 |
| December 3, 2025 | 5,827 | $77.81 | $453,405 |
| December 3, 2025 | 5,455 | $79.09 | $431,442 |
| December 3, 2025 | 433 | $79.53 | $34,436 |

In addition, Omnadora Capital LLC ("Omnadora") made insider sales during the Relevant Period. The Form 4s filed with the SEC associated with these trades states that Defendant Intrator is the sole manager of Omnadora's manager, Omnadora Management LLC. During the Relevant Period, Omnadora made the following sales:

| **Date** | **Number of Shares** | **Avg. Price/Share ($)** | **Proceeds ($)** |
|---|---|---|---|
| September 10, 2025 | 606 | $110.11 | $66,725 |
| September 10, 2025 | 61 | $111.80 | $6,820 |
| September 10, 2025 | 61 | $112.80 | $6,881 |
| September 10, 2025 | 1,879 | $114.82 | $215,741 |
| September 10, 2025 | 6,524 | $115.79 | $755,407 |
| September 10, 2025 | 5,704 | $116.71 | $665,698 |
| September 10, 2025 | 5,641 | $117.59 | $663,305 |
| September 10, 2025 | 9,175 | $118.84 | $1,090,322 |
| September 10, 2025 | 11,959 | $119.57 | $1,429,902 |
| September 10, 2025 | 6,076 | $120.56 | $732,516 |
| September 10, 2025 | 1,465 | $121.55 | $178,068 |
| September 10, 2025 | 485 | $123.09 | $59,698 |
| September 10, 2025 | 364 | $124.25 | $45,225 |
| September 24, 2025 | 303 | $124.85 | $37,828 |
| September 24, 2025 | 2,201 | $126.44 | $278,298 |
| September 24, 2025 | 4,557 | $127.40 | $580,574 |
| September 24, 2025 | 7,176 | $128.36 | $921,127 |
| September 24, 2025 | 7,684 | $129.42 | $994,494 |
| September 24, 2025 | 8,187 | $120.27 | $984,644 |
| September 24, 2025 | 9,575 | $131.53 | $1,259,400 |
| September 24, 2025 | 6,487 | $132.30 | $858,222 |
| September 24, 2025 | 3,839 | $133.28 | $511,679 |
| October 8, 2025 | 2,183 | $132.09 | $288,344 |
| October 8, 2025 | 5,161 | $133.05 | $686,666 |
| October 8, 2025 | 3,802 | $133.99 | $509,446 |

| | | | |
|---|---|---|---|
| October 8, 2025 | 5,490 | $135.07 | $741,541 |
| October 8, 2025 | 8,972 | $135.96 | $1,219,817 |
| October 8, 2025 | 1,770 | $137.07 | $242,618 |
| October 8, 2025 | 7,448 | $138.10 | $1,028,538 |
| October 8, 2025 | 4,675 | $139.12 | $650,376 |
| October 8, 2025 | 10,256 | $139.88 | $1,434,579 |
| October 8, 2025 | 243 | $140.62 | $34,171 |
| October 22, 2025 | 8,026 | $155.94 | $1,251,605 |
| October 22, 2025 | 8,705 | $115.94 | $1,009,291 |
| October 22, 2025 | 5,938 | $117.12 | $695,443 |
| October 22, 2025 | 5,063 | $117.97 | $597,301 |
| October 22, 2025 | 3,614 | $119.02 | $430,146 |
| October 22, 2025 | 1,625 | $120.24 | $195,393 |
| October 22, 2025 | 6,528 | $121.25 | $791,518 |
| October 22, 2025 | 7,300 | $121.95 | $890,205 |
| October 22, 2025 | 2,601 | $122.98 | $319,863 |
| October 22, 2025 | 600 | $123.81 | $74,285 |
| November 5, 2025 | 15,376 | $112.73 | $1,733,266 |
| November 5, 2025 | 1,5623 | $113.65 | $1,775,504 |
| November 5, 2025 | 11,518 | $114.59 | $1,319,874 |
| November 5, 2025 | 2,539 | $115.54 | $293,357 |
| November 5, 2025 | 3,492 | $116.71 | $407,560 |
| November 5, 2025 | 728 | $117.28 | $85,381 |
| November 5, 2025 | 364 | $118.30 | $43,061 |
| November 19, 2025 | 11,096 | $73.58 | $816,461 |
| November 19, 2025 | 22,992 | $74.55 | $1,714,139 |
| November 19, 2025 | 11,121 | $75.48 | $839,404 |
| November 19, 2025 | 4,488 | $76.22 | $342,061 |
| November 19, 2025 | 303 | $77.05 | $23,345 |
| December 3, 2025 | 4,299 | $74.17 | $318,860 |
| December 3, 2025 | 4,136 | $75.05 | $310,422 |
| December 3, 2025 | 1,2631 | $76.00 | $959,947 |
| December 3, 2025 | 10,886 | $77.05 | $838,747 |
| December 3, 2025 | 8,976 | $77.81 | $698,432 |
| December 3, 2025 | 8,405 | 7$9.09 | $664,761 |
| December 3, 2025 | 667 | $79.53 | $53,045 |

Thus, in total, before the fraud was exposed, Defendant Intrator sold 876,785 shares of Company common stock on inside information, for which he received approximately $103.3 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and

participating in the scheme.

28. The Form 424B4 Prospectus the Company filed with the SEC on March 31, 2025 in connection with the IPO (the "Form 424B4") stated the following about Defendant Intrator:

> Michael Intrator is one of our co-founders and has served as Chairman of our board of directors and as our Chief Executive Officer and President since September 2017. Previously, from January 2013 to January 2018, Mr. Intrator was a co-founder and the Chief Executive Officer of Hudson Ridge Asset Management LLC, a natural gas hedge fund. From September 1998 to July 2014, he served in roles of increasing responsibilities, including as a Principal Portfolio Manager, for the asset management and advisory firm Natsource Asset Management LLC, where he oversaw investments in global environmental markets and related energy products. Mr. Intrator earned a B.A. in Political Science from Binghamton University, and an M.P.A. from Columbia University's School of International and Public Affairs. We believe Mr. Intrator is qualified to serve as a member of our board of directors due to the perspective and experience he brings as our co-founder, Chief Executive Officer, and President.

**Defendant Agrawal**

29. Defendant Agrawal has served as the Company's CFO since March 2024.

30. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Agrawal made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| May 20, 2025 | 7,131 | $100.16 | $714,241 |
| June 11, 2025 | 61,546 | $154.90 | $9,533,475 |
| August 20, 2025 | 6,010 | $89.99 | $540,859 |
| August 26, 2025 | 1,553 | $91.33 | $141,833 |
| August 26, 2025 | 1,003 | $92.06 | $92,340 |
| August 26, 2025 | 756 | $93.05 | $70,348 |
| August 26, 2025 | 200 | $93.94 | $18,788 |
| September 11, 2025 | 63,230 | $115.29 | $7,289,774 |
| September 16, 2025 | 2,800 | $116.02 | $324,853 |
| September 16, 2025 | 8,977 | $116.91 | $1,049,471 |
| September 16, 2025 | 13,140 | $ 118.03 | $1,550,854 |
| September 16, 2025 | 9,118 | $ 118.79 | $1,083,151 |
| September 16, 2025 | 1,590 | $119.90 | $190,643 |
| September 16, 2025 | 1,100 | $120.83 | $132,910 |

| | | | |
|---|---|---|---|
| September 16, 2025 | 1,000 | $122.21 | $122,214 |
| September 16, 2025 | 398 | $123.48 | $49,145 |
| September 16, 2025 | 199 | $124.43 | $24,762 |
| September 16, 2025 | 100 | $125.31 | $12,531 |
| November 20, 2025 | 5,841 | $82.55 | $482,175 |
| November 25, 2025 | 5,841 | $82.55 | $482,175 |
| November 25, 2025 | 900 | $70.43 | $63,390 |
| November 25, 2025 | 1,650 | $71.38 | $117,775 |
| November 25, 2025 | 200 | $72.04 | $14,407 |
| December 11, 2025 | 66,467 | $82.58 | $5,488,532 |

Thus, in total, before the fraud was exposed, Defendant Agrawal sold 254,909 shares of Company common stock on inside information, for which he received approximately $29.1 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

31. The Form 424B4 stated the following about Defendant Agrawal:

> Nitin Agrawal has served as our Chief Financial Officer since March 2024. Prior to joining us, from May 2021 to March 2024, he served as Vice President, Finance of Google Cloud, the cloud computing services business segment of Alphabet Inc. From August 2019 to April 2021, Mr. Agrawal served as Chief Financial Officer of Mapbox, Inc., a location technology company. Prior to that, from January 2015 to July 2019, he served as Finance Director of the Compute Services division of Amazon Web Services, Inc., a cloud computing company and subsidiary of Amazon.com, Inc. Mr. Agrawal holds a Bachelor of Technology, Engineering from the National Institute of Technology in Kurukshetra, India, and an M.B.A. in Finance from The Fuqua School of Business at Duke University.

**Defendant McBee**

32. Defendant McBee co-founded the Company and has served as the Company's CDO since March 2024. He previously served as the Company's Chief Strategy Officer ("CSO") from September 2017 to March 2024.

33. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant McBee made the following sales of

Company common stock:

| **Date** | **Number of Shares** | **Avg. Price/Share ($)** | **Proceeds ($)** |
|---|---|---|---|
| May 31, 2025 | 50,126 | $111.31 | $5,579,525 |
| June 30, 2025 | 58,387 | $159.99 | $9.341.336 |
| August 19, 2025 | 19,746 | $89.37 | $1,764,680 |
| August 19, 2025 | 46,088 | $90.15 | $4,154,773 |
| August 19, 2025 | 41,894 | $91.15 | $3,818,617 |
| August 19, 2025 | 91,240 | $92.32 | $8,423,222 |
| August 19, 2025 | 38,129 | $92.89 | $3,541,898 |
| August 19, 2025 | 6,680 | $94.07 | $628,388 |
| August 19, 2025 | 3,093 | $95.25 | $294,622 |
| August 19, 2025 | 2,320 | $96.17 | $223,114 |
| August 26, 2025 | 69,530 | $91.12 | $6,335,553 |
| August 26, 2025 | 112,272 | $91.77 | $10,303,213 |
| August 26, 2025 | 44,182 | $92.70 | $4,095,596 |
| August 26, 2025 | 21,886 | $93.70 | $2,050,681 |
| August 26, 2025 | 2,130 | $94.54 | $201,374 |
| September 2, 2025 | 28,735 | $91.35 | $2,625,034 |
| September 2, 2025 | 104,694 | $92.30 | $9,663,434 |
| September 2, 2025 | 40,167 | $93.25 | $3,745,661 |
| September 2, 2025 | 30,611 | $94.22 | $2,884,181 |
| September 2, 2025 | 32,761 | $95.27 | $3,121,226 |
| September 2, 2025 | 11,012 | $96.03 | $1,057,504 |
| September 2, 2025 | 1,880 | $96.77 | $181,928 |
| September 9, 2025 | 53,735 | $97.78 | $5,254,364 |
| September 9, 2025 | 76,005 | $98.58 | $7,492,216 |
| September 9, 2025 | 22,002 | $99.75 | $2,194,803 |
| September 9, 2025 | 61,683 | $100.54 | $6,201,886 |
| September 9, 2025 | 30,875 | $101.54 | $3,135,186 |
| September 9, 2025 | 5,500 | $102.63 | $564,450 |
| September 9, 2025 | 200 | $103.19 | $20,638 |
| September 16, 2025 | 16,215 | $115.98 | $1,880,650 |
| September 16, 2025 | 56,096 | $116.85 | $6,555,092 |
| September 16, 2025 | 82,303 | $117.96 | $9,708,182 |
| September 16, 2025 | 68,032 | $118.74 | $8,078,297 |
| September 16, 2025 | 8,784 | $119.84 | $1,052,638 |
| September 16, 2025 | 6,880 | $120.84 | $831,407 |
| September 16, 2025 | 4,864 | $121.86 | $592,736 |
| September 16, 2025 | 3,680 | $123.03 | $452,766 |
| September 16, 2025 | 1,946 | $123.79 | $240,900 |
| September 16, 2025 | 1,120 | $124.87 | $139,856 |
| September 16, 2025 | 80 | $125.58 | $10,046 |
| September 23, 2025 | 5,160 | $127.82 | $659,525 |

| | | | |
|---|---|---|---|
| September 23, 2025 | 12,091 | $128.81 | $1,557,451 |
| September 23, 2025 | 22,475 | $129.61 | $2,912,897 |
| September 23, 2025 | 56,733 | $120.74 | $6,849,999 |
| September 23, 2025 | 47,171 | $131.69 | $6,212,067 |
| September 23, 2025 | 42,199 | $132.64 | $5,597,389 |
| September 23, 2025 | 41,296 | $133.67 | $5,520,016 |
| September 23, 2025 | 19,875 | $134.54 | $2,673,935 |
| September 23, 2025 | 3,000 | $135.47 | $406,407 |
| September 30, 2025 | 57,903 | $139.44 | $8,073,994 |
| September 30, 2025 | 200 | $134.16 | $26,831 |
| September 30, 2025 | 400 | $135.01 | $54,003 |
| September 30, 2025 | 40,187 | $136.78 | $5,496,702 |
| September 30, 2025 | 19,676 | $137.75 | $2,710,336 |
| September 30, 2025 | 15,638 | $138.61 | $2,167,619 |
| September 30, 2025 | 10,715 | $139.62 | $1,496,033 |
| September 30, 2025 | 10,221 | $140.77 | $1,438,858 |
| September 30, 2025 | 2,523 | $141.59 | $357,242 |
| September 30, 2025 | 400 | $142.44 | $56,975 |
| December 2, 2025 | 14,306 | $76.23 | $1,090,592 |
| December 2, 2025 | 25,818 | $77.56 | $2,002,563 |
| December 2, 2025 | 30,173 | $78.40 | $2,365,548 |
| December 2, 2025 | 9,947 | $79.42 | $790,028 |
| December 2, 2025 | 8,720 | $80.50 | $701,935 |
| December 2, 2025 | 9,781 | $81.46 | $796,794 |
| December 2, 2025 | 4,090 | $ 82.24 | $336,366 |
| December 8, 2025 | 102,835 | $83.80 | $8,617,923 |
| December 15, 2025 | 41,709 | $72.49 | $3,023,586 |
| December 15, 2025 | 41,451 | $ 73.67 | $3,053,604 |
| December 15, 2025 | 11,728 | $ 74.37 | $872,257 |
| December 15, 2025 | 2,062 | $75.59 | $155,873 |
| December 15, 2025 | 1,544 | $ 76.57 | $118,228 |
| December 15, 2025 | 2,043 | $ 78.30 | $159,962 |
| December 15, 2025 | 2,298 | $79.38 | $182,420 |

Thus, in total, before the fraud was exposed, Defendant McBee sold 2,073,931 shares of Company common stock on inside information, for which he received approximately $217 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

34. The Form 424B4 stated the following about Defendant McBee:

> Brannin McBee is one of our co-founders and has served as our Chief Development Officer since March 2024. From September 2017 to March 2024, Mr. McBee served as our Chief Strategy Officer. Previously, he worked as a Proprietary Trader at Active Power Investments, a company in the North American Natural Gas, Power and Agriculture markets from April 2020 to January 2021. From March 2017 to August 2018, Mr. McBee was Vice President at Fourth Floor Coastal LLC, an exploration and production company in the oil and gas industry. Prior to that, from January 2013 to January 2018, he was a proprietary trader at Windy Bay Power LLC, a commodity-focused hedge fund. Mr. McBee earned a B.S. in Finance from the University of Colorado Boulder.

**Defendant Boone**

35. Defendant Boone has served as a Company director since January 2025. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee.

36. The Form 424B4 stated the following about Defendant Boone:

> Karen Boone has served as a member of our board of directors since January 2025. Ms. Boone previously served as the Interim Co-Chief Executive Officer and Co-President of Peloton Interactive, Inc. ("Peloton") from May 2024 to January 2025. Prior to her service at Peloton, Ms. Boone served as the President and Chief Financial and Administrative Officer of Restoration Hardware, Inc., a home furnishings company, from May 2014 to August 2018 and as Chief Financial Officer from June 2012 to May 2014. Prior to that, from 1996 to 2012, Ms. Boone held various roles at Deloitte & Touche LLP, a public accounting firm, most recently as an Audit Partner. Ms. Boone currently serves on the board of directors of Peloton, Sonos, Inc., Rivian Automotive, Inc. and several private companies. Ms. Boone earned a B.S. in Business Economics from the University of California, Davis. We believe Ms. Boone is qualified to serve as a member of our board of directors due to her financial expertise and her experience as a public company executive officer and director.

**Defendant Cogen**

37. Defendant Cogen has served as a Company director since September 2017. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

38. The Form 424B4 stated the following about Defendant Cogen:

> Jack Cogen has served as a member of our board of directors since September 2017. Mr. Cogen is a private investor. From September 1994 to December 2014, Mr. Cogen was a founder and the Chief Executive Officer of Natsource Asset Management LLC, an asset management and advisory firm focused on global environmental markets and related energy products. Additionally, from January 2008 to January 2011, Mr. Cogen served as Chair of the International Emissions Trading Association (the "IETA"), a non-profit trade organization committed to promoting high-integrity markets for corporate carbon footprint reduction, and Mr. Cogen continues to support the IETA as a Fellow. Mr. Cogen also previously served as a non-employee director of Hudson Ridge Asset Management LLC, a natural gas hedge fund, from November 2013 to June 2018. Mr. Cogen earned a B.A. from Rutgers University, as well as an M.S. in Mathematics and an M.B.A. from New York University. We believe Mr. Cogen is qualified to serve as a member of our board of directors due to his experience with technology companies and as an investor in our industry.

**<u>Defendant Hutchins</u>**

39. Defendant Hutchins has served as the Company's Lead Independent Director since February 2025. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.

40. The Form 424B4 stated the following about Defendant Hutchins:

> Glenn Hutchins has served as a member of our board of directors since February 2025. Mr. Hutchins currently serves as the Chairman of North Island, an investment firm, a role he has held since 2013, and as Chairman of North Island Ventures, an investment firm, since 2020. He was a cofounder of Silver Lake, a technology investment firm, which was founded in 1999, and of which Mr. Hutchins served as Co-Chief Executive Officer until 2011 and, prior to that, as Managing Director from 1999 to 2011. Prior to that, Mr. Hutchins was a Senior Managing Director at The Blackstone Group, a global investment firm, from 1994 to 1999. He has served as a director of AT&T Inc., a telecommunications company, since June 2014 and as Vice Chairman and Lead Independent Director of Banco Santander S.A., a financial services firm, since December 2022. Previously, Mr. Hutchins served as a director of Virtu Financial, Inc., a financial services firm, from July 2017 to August 2021 and as a director at Nasdaq, Inc., a global financial services technology company, from April 2005 to July 2017. Mr. Hutchins has served as the Co-Chairman of the Brookings Institution since November 2018 and was a director of the Federal Reserve Bank of New York from 2011 to 2020. He holds an A.B. from Harvard College, an M.B.A. from Harvard Business School, and a J.D. from Harvard Law School. We believe Mr. Hutchins is qualified to serve as a member of our board of directors due to his extensive operational, business planning, and investment expertise within the technology industry.

**Defendant Venturo**

41. Defendant Venturo co-founded the Company and has served as a Company director and as the Company's CSO since April 2019. He previously served as the Company's Chief Technology Officer ("CTO") from October 2017 to March 2024.

42. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Venturo made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| May 31, 2025 | 54,886 | $111.31 | $6,109,361 |
| June 30, 2025 | 64,734 | $145.99 | $9,450,517 |
| September 30, 2025 | 65,593 | $139.44 | $9,146,288 |
| October 6, 2025 | 4,078 | $124.20 | $506,508 |
| October 6, 2025 | 3,701 | $135.38 | $501,037 |
| October 6, 2025 | 5,360 | $136.20 | $730,058 |
| October 6, 2025 | 11,691 | $137.34 | $1,605,626 |
| October 6, 2025 | 6,502 | $138.39 | $899,794 |
| October 6, 2025 | 17,550 | $139.33 | $2,445,198 |
| October 6, 2025 | 2,605 | $140.09 | $364,936 |
| October 6, 2025 | 400 | $141.20 | $56,481 |
| October 6, 2025 | 600 | $142.53 | $85,518 |
| October 6, 2025 | 300 | $143.85 | $43,155 |

Thus, in total, before the fraud was exposed, Defendant Venturo sold 238,000 shares of Company common stock on inside information, for which he received approximately $32 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

43. The Form 424B4 stated the following about Defendant Venturo:

> Brian Venturo is one of our co-founders and has served as a member of our board of directors since April 2019 and as our Chief Strategy Officer since March 2024. From October 2017 to March 2024, Mr. Venturo served as our Chief Technology

> Officer. Previously, from January 2013 to January 2018, Mr. Venturo was a Partner at Hudson Ridge Asset Management LLC, a natural gas hedge fund. From May 2007 to December 2012, he served as Portfolio Manager – Energy and Emissions for the asset management and advisory firm Natsource Asset Management LLC, where he managed a proprietary trading portfolio of investments in global environmental markets and related energy products. Mr. Venturo earned a B.A. in Economics from Haverford College. We believe Mr. Venturo is qualified to serve as a member of our board of directors due to the perspective and experience he brings as our co-founder and Chief Strategy Officer.

**Defendant Whitman**

44. Defendant Whitman has served as a Company director since March 2025. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

45. The Form 424B4 stated the following about Defendant Whitman:

> Margaret C. Whitman has served as a member of our board of directors since March 2025. Ms. Whitman previously served as United States Ambassador to Kenya from July 2022 to November 2024. Prior to that, she was Chief Executive Officer of Quibi Holdings, LLC, a mobile media company, from March 2018 to February 2021. From June 2017 to February 2018, Ms. Whitman served as Chief Executive Officer of Hewlett Packard Enterprise Company ("HPE"), a multinational information technology enterprise, and as HPE's President and Chief Executive Officer from November 2015 to June 2017. Before her role at HPE, she was President and Chief Executive Officer of Hewlett-Packard Company (now known as HP Inc.) from September 2011 to July 2015, as well as Chair of their board of directors from July 2014 to November 2015. Ms. Whitman also served as President and Chief Executive Officer of eBay Inc., an e-commerce company, from March 1998 to November 2008. Ms. Whitman has previously served on the boards of directors of The Procter & Gamble Company, a multinational consumer goods company, from February 2011 to July 2022, General Motors Company, a multinational automotive manufacturing company, from March 2021 to July 2022, and Dropbox, Inc., a cloud storage company, from September 2017 to May 2020. Ms. Whitman holds an A.B. in Economics from Princeton University and an MBA from Harvard Business School. We believe Ms. Whitman is qualified to serve as a member of our board of directors due to her extensive leadership, strategy, risk management, and industry experience.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

46. By reason of their positions as officers, directors, and/or fiduciaries of CoreWeave

and because of their ability to control the business and corporate affairs of CoreWeave, the Individual Defendants owed CoreWeave and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage CoreWeave in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of CoreWeave and its shareholders so as to benefit all shareholders equally.

47. Each director and officer of the Company owes to CoreWeave and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

48. The Individual Defendants, because of their positions of control and authority as directors and/or officers of CoreWeave, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

49. To discharge their duties, the officers and directors of CoreWeave were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

50. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CoreWeave, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the

Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised CoreWeave's Board at all relevant times.

51. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

52. To discharge their duties, the officers and directors of CoreWeave were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of CoreWeave were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New Jersey, and the United States, and pursuant to CoreWeave's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so

as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how CoreWeave conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of CoreWeave and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that CoreWeave's operations would comply with all applicable laws and CoreWeave's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

53. Each of the Individual Defendants further owed to CoreWeave and the shareholders

the duty of loyalty requiring that each favor CoreWeave's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

54. At all times relevant hereto, the Individual Defendants were the agents of each other and of CoreWeave and were at all times acting within the course and scope of such agency.

55. Because of their advisory, executive, managerial, directorial, and controlling positions with CoreWeave, each of the Individual Defendants had access to adverse, non-public information about the Company.

56. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by CoreWeave.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

57. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

59. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of CoreWeave was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

61. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CoreWeave and was at all times acting within the course and scope of such agency.

## COREWEAVE'S CODE OF CONDUCT

62. CoreWeave's Code of Conduct states that it "applies to our employees, contractors, consultants, agents, representatives, officers and members of our Board."

63. In a section titled "Honest and Ethical Conduct," under a subheading titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

> You must act within our guidelines that prohibit real, perceived and potential conflicts of interest with your role at CoreWeave. Generally, conflicts of interest are situations that divide your loyalty between CoreWeave, on the one hand, and

> your own personal interests, on the other. Determining whether a conflict of interest exists is not always easy to do. Even the appearance of a conflict of interest could create a problem. Before engaging in any activity, transaction or relationship that might give rise to a conflict of interest, you must first notify your manager and the People team or, if you are a Board member, the Chair of the Audit Committee of the Board ("Audit Committee"), and then receive written approval from our Compliance Officer to engage in the activity, transaction and/or relationship.

64. In the same section, under a subheading titled 'Corporate Opportunities," the Code of Conduct states:

> You may not take advantage of any opportunities discovered through your job with CoreWeave for personal gain, or for the personal gain of a roommate, close friend, relative or significant other, unless the opportunity is disclosed to and pre-approved by our Compliance Officer. These opportunities include, among others, CoreWeave's sales and other business development opportunities, inventing products or services and writing books.

65. In the section titled "Complying with the Law," the Code of Conduct states, in relevant part:

> Everyone at CoreWeave is expected to comply with the law. Laws can be complex and at times, even counterintuitive. Although it's impossible to know all aspects of every law, you should understand the major laws, rules and regulations that apply to your work. You should consult with our Compliance Officer if you are unsure or have any questions or concerns related to your work. Please keep in mind that being unaware of a law is never a defense for violating a law. A few specific areas of legal compliance are discussed in greater detail below.
>
> Insider Trading
>
> Because we believe firmly in transparency and trust across the organization, you may find yourself in possession of inside information. The definition of inside information is any material nonpublic information, positive or negative, about CoreWeave or other organizations with which we work. For a definition of "material nonpublic information," please see CoreWeave's Insider Trading Policy. Remember that we also may possess confidential information about our customers, partners or other third parties. It is equally important that we treat this information with the same care that we treat our own.
>
> The bottom line is that we never buy or sell securities based on inside information, nor do we tip off others to do so. It doesn't matter how we learned the information—using material nonpublic information to trade securities is never acceptable. Doing so violates the law and the trust we have built with internal and external

> stakeholders, and others.
>
> To learn more, please review our Insider Trading Policy, which explains how you lawfully can trade in our stock, as well as our trading windows, blackout periods and trading plans.

66. In a section titled "Financial Matters and Business Practices," the Code of Conduct states, in relevant part:

> You are expected to act responsibly and exercise sound judgment with respect to our finances and financial and other public reporting. Investors rely on accurate and fair financial and business information to understand our financial results and make informed decisions. You may execute financial transactions only with authorization and in compliance with our policies. You also are expected to record and report all financial transactions and business information honestly and accurately, to comply with our system of internal controls and to follow applicable laws, regulations and accounting practices.
>
> We regularly file reports and other documents with regulatory authorities, including the SEC. In addition, we may make other public communications, such as press releases, from time to time.
>
> Depending upon your position with CoreWeave, you may be called upon to provide information to help ensure that our public reports and communications are complete, fair, accurate and understandable. You are expected to use all reasonable efforts to provide complete, accurate, objective, relevant, timely and understandable answers to inquiries related to our public disclosures. Employees involved in preparing public reports, including sustainability reports, and communications must use all reasonable efforts to comply with our disclosure controls and procedures.
>
> If you believe that any disclosure is materially misleading or if you become aware of any material information that you believe should be disclosed to the public, it is your responsibility to bring this information to the attention of our Compliance Officer. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should follow the procedures set forth in our Whistleblower Policy.
>
> SEC Reporting and Financial Statement Preparation
>
> Our periodic reports and other documents filed with the SEC, including all financial statements and other financial information included therein, must comply with applicable federal securities laws and SEC rules. If you contribute in any way to the preparation or verification of our financial statements and other financial information, you must ensure that our books, records and accounts are accurately

> maintained. You must also cooperate fully with our Accounting, Finance and Treasury departments, as well as our independent public accountants and legal counsel. If you are involved in the preparation of our SEC reports or financial statements, you must:
>
> ● Be familiar with and comply with our disclosure controls and procedures and our internal control over financial reporting; and
>
> ● Take all necessary steps to ensure that all filings with the SEC and all other public communications about our financial and business condition provide full, fair, accurate, timely and understandable disclosure.

67. In a section titled "A Place Where You Can Do Your Best Work," under a subheading titled "Penalties for Violations of CoreWeave Policies," the Code of Conduct states:

> You are expected to be familiar with and comply with all CoreWeave policies. If you have a question regarding any course of conduct, consult your supervisor or our Compliance Officer before moving forward. Those who violate our policies are subject to disciplinary action up to and including termination of employment. Examples of misconduct that may result in disciplinary measures includes:
>
> ● Violating any CoreWeave policy;
>
> ● Failing to report known or suspected violations of any CoreWeave policy;
>
> ● Failure to cooperate in a CoreWeave investigation into possible violations of CoreWeave policies; and
>
> ● Engaging in retaliation.

68. In the section "Changes to this Code," the Code of Conduct states:

> Our Board (including, with respect to waivers, a committee of our Board if allowed under the rules of the securities exchange on which our securities are listed) reserves the right in its sole discretion to modify or grant waivers to this Code. Any amendments or waiver may be publicly disclosed if required by applicable laws, rules and regulations.

69. In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law,

including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## AUDIT COMMITTEE CHARTER

70. The Company also maintains an Audit Committee Charter. Under the section titled "Purpose," the Audit Committee Charter states, in relevant part:

> The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of CoreWeave, Inc. (the "Company") is to assist the Board in fulfilling its oversight responsibilities relating to:
>
> ● the Company's accounting and financial reporting processes and internal controls, including audits and the integrity of the Company's financial statements;
>
> ● the qualifications, independence and performance of the Company's independent auditors (the "Independent Auditors");
>
> ● risk assessment and management; and
>
> ● compliance by the Company with legal and regulatory requirements.

71. In the section titled "Responsibilities and Duties," under a subheading titled "Financial Statements and Disclosures," the Audit Committee Charter states, in relevant part:

> The Committee will:
>
> 1. Prior to distribution to the public, review and discuss with management and the Independent Auditors, the Company's quarterly and annual financial results, earnings press releases and earnings guidance provided to analysts and rating agencies, and other public announcements regarding the Company's operating results.
>
> 2. Review and discuss the following with management and the Independent Auditors, as applicable:
>
> ● the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and recommend to the Board whether the annual financial statements

> should be included in the Company's Annual Report on Form 10-K;
>
> ***
>
> ● any significant issues, events and transactions as well as any significant changes regarding accounting principles, practices, policies, judgments or estimates.

72. Under the same section, under a subheading titled "Internal Controls," the Audit Committee Charter states, in relevant part:

> With respect to the Company's internal controls, the Committee will:
>
> 1. Review and discuss with the Company's management and the Independent Auditors, and provide oversight over, the design, implementation, adequacy and effectiveness of the Company's accounting and financial processes and systems of internal controls and material changes in such controls, including any control deficiencies, significant deficiencies and material weaknesses in their design or operation.
>
> 2. Review any allegations of fraud that are disclosed to the Committee involving management or any employee of the Company with a significant role in the Company's accounting and financial reporting process and systems of internal controls.
>
> ***
>
> 4. Periodically consult with the Independent Auditors out of the presence of the Company's management about internal controls, the fullness and accuracy of the Company's financial statements and any other matters that the Committee or the Independent Auditors believe should be discussed privately with the Committee.
>
> 5. Establish procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (b) the confidential anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Oversee the review of any such complaints and submissions that have been received, including the current status and the resolution, if one has been reached.

73. In the same section, under a subheading titled "Risk Oversight and Compliance," the Audit Committee Charter states:

> The Committee will:
>
> 1. Review with management the Company's major financial risks and enterprise

> exposures and the steps management has taken to monitor or mitigate such risks and exposures, including the Company's procedures and any related policies with respect to risk assessment and risk management.
>
> 2. Review with management the Company's risk exposures in other areas, as the Committee deems necessary or appropriate from time to time.
>
> 3. Review with management the Company's (a) programs for promoting and monitoring compliance with applicable legal and regulatory requirements, and (b) major legal and regulatory compliance risk exposures and the steps management has taken to monitor or mitigate such exposures.
>
> 4. Review the status of any significant legal and regulatory matters and any material reports or inquiries received from regulators or government agencies that reasonably could be expected to have a significant impact on the Company's financial statements.

74. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background*

75. CoreWeave is a technology company providing cloud and technology services that are purportedly capable of delivering computing infrastructure and services at massive scale, primarily targeting large data centers. The Company calls its proprietary infrastructure and services the CoreWeave Cloud Platform.

76. CoreWeave typically enters into long-term contracts with data center customers for CoreWeave to install and manage its proprietary infrastructure and software services through the CoreWeave Cloud Platform. CoreWeave refers to large data center customers as "powered shells," which house the hardware that the CoreWeave Cloud Platform runs on. Once CoreWeave enters into a contract with a customer, it proceeds to purchase infrastructure components and install systems required to run the CoreWeave Cloud Platform. Once the infrastructure is installed, CoreWeave will begin to recognize revenues from the customer.

77. On March 10, 2025, CoreWeave issued the OpenAI Announcement Press Release which announced the Company had entered into an agreement to provide OpenAI with infrastructure and other services. The OpenAI Announcement Press Release stated that the deal was worth up to $11.9 billion.

***October 30, 2025 Core Scientific Failed Acquisition***

78. On October 30, 2025, Core Scientific announced that CoreWeave's acquisition of Core Scientific did not garner enough shareholder votes, and as such, that the merger agreement was terminated.

79. On this news, the price of the Company's stock fell $8.87 per share, or approximately 6.3%, from a closing price of $139.93 per share on October 29, 2025, to close at $131.06 per share on October 30, 2025.

80. In the thirty days preceding the failed merger between Core Scientific and CoreWeave and subsequent stock price drop, three of the Individual Defendants made lucrative insider sales.

81. Defendant Intrator, between himself and Omnadora, made fifty-three insider sales between September 30, 2025 and October 22, 2025, selling a total of 305,238 shares for total

proceeds of approximately $40.4 million.

82. Defendant McBee made ten insider sales on September 30, 2025, selling a total of 157,863 shares for total proceeds of approximately $22 million.

83. Defendant Venturo made ten insider sales on October 6, 2025, selling a total of 52,787 shares for total proceeds of approximately $7.2 million.

84. Thus, in total, in the thirty days before the failed Core Scientific Acquisition, Defendants Intrator, McBee, and Venturo sold 415,888 shares of Company common stock on inside information, for which they received approximately $69.6 million in proceeds. Their insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate their motives in facilitating and participating in the scheme.

***November 15, 2025 Financial Reports***

85. On November 10, 2025, the Company issued a press release reporting disappointing financial results for the third quarter of 2025 (the "3Q 2025 Earnings Press Release"). The 3Q 2025 Earnings Press Release revealed that the Company was lowering 2025 full-year guidance for revenue, operating income, capital spending, and active power capacity.

86. In the fourteen days preceding the disappointing financial results, and subsequent stock price drop, Defendant Intrator made lucrative insider sales.

87. Defendant Intrator, between himself and Omnadora, made fourteen insider sales on November 5, 2025, selling a total of 82,095 shares for total proceeds of approximately $9.6 million. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motives in facilitating and participating in the scheme.

***December 15, 2025 Wall Street Journal Article***

88. On December 15, 2025, after market hours, The Wall Street Journal Article was published by the Wall Street Journal which revealed additional details about the delays causing the Company to lower its 2025 full-year guidance. The Wall Street Journal detailed that CoreWeave had known about weather and design-related delays related to its data center customers since February 2025.

89. In the twenty-nine days preceding the publication of the Wall Street Journal Article, and subsequent stock price drop, three of the Individual Defendants made lucrative insider sales.

90. Defendant Intrator, between himself and Omnadora, made twenty-four insider sales between November 19, 2025 and December 3, 2025, selling a total of 164,910 shares for total proceeds of approximately $12.5 million.

91. Defendant Agrawal made five insider sales between November 20, 2025 and December 11, 2025, selling a total of 75,058 shares for total proceeds of approximately $6.2 million.

92. Defendant McBee made fifteen insider sales between December 2, 2025 and December 15, 2025, selling a total of 308,505 shares for total proceeds of approximately $24.3 million.

93. Thus, in total, in the twenty-nine days before the publication of the Wall Street Journal Article, Defendants Intrator, Agrawal, and McBee sold 548,473 shares of Company common stock on inside information, for which they received approximately $43 million in proceeds. Their insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate their motives in facilitating and participating in the scheme.

**False and Misleading Statements**

***March 31, 2025 Form 424B4***

94. On March 31, 2025, the Company filed the Form 424B4 with the SEC. The Form 424B4 described the Company as the "the AI Hyperscaler driving the AI revolution." The Form 424B4 defined a "Hyperscaler" as "[a] cloud provider or technology company that is capable of delivering computing infrastructure and services at massive scale, typically through large data centers and geographically distributed networks."

95. The Form 424B4 additionally touted the Company's ability to scale its AI infrastructure, stating the following, in relevant part:

> Competitive Strengths. ***Our key competitive strengths, which we believe set us apart from the generalized cloud providers in the industry, include: . . . We operate at scale***. We benefit from a network of 32 active purpose-built data centers that together ran more than 250,000 GPUs as of December 31, 2024. ***Our specialization in deploying AI infrastructure at massive scale enables us to serve some of the world's leading providers of AI who require massive deployments, benefit from clear economies of scale, and detect issues and derive insights from across our AI infrastructure sooner than our competitors.***

96. The Form 424B4 also highlighted the purported value of CoreWeave's services to its customers, stating:

> ***Our ability to abstract away the complexity our customers would face in assembling, managing, and deploying this infrastructure themselves establishes us as a critical partner and leads to long-term, durable relationships that have the potential to expand over time.*** As evidence of this, three of our top five committed contract customers by total contract value ("TCV") as of December 31, 2024 signed agreements for additional capacity within 12 months of their respective initial purchase dates. These agreements, measured during each respective 12-month period from the initial date of signing, represent a cumulative increase of approximately $7.8 billion in committed spend and a multiple of approximately 4x on initial contract value. Our deep relationships with customers are a competitive advantage, and our first-to-market track record with highly performant technology gives customers confidence in choosing CoreWeave.

97. In the Form 424B4, CoreWeave also touted its coordination with third parties, noting that such coordination allowed the Company to provide customers with the infrastructure

that would meet their needs. In relevant part, the 424B4 stated:

> Our purpose-built technology stack is augmented by our lifecycle management and monitoring software, Mission Control and Observability, and our advanced cluster validation, proactive health checking capabilities, and observability capabilities. Our AI cloud runs in a distributed network of 32 active purpose-built data centers, which are specifically engineered to support high intensity AI workloads with features including enhanced power, liquid cooling, and networking components, reinforcing the robustness of our entire technology stack. ***Our Third-Party Tooling and Solutions further enhance this flexibility by providing a composable architecture that allows customers to customize their solution by integrating additional third-party tools.***

***May 14, 2025 Earnings Call***

98. On May 14, 2025, the Company held the 1Q 2025 Earnings Call to discuss its financial results for the first quarter of 2025. During the 1Q 2025 Earnings Call, Defendant Agrawal highlighted the revenues resulting from CoreWeave's purported ability to meet customer demand. Specifically, Defendant Agrawal stated:

> ***For 2025, we expect revenue to be in the range of $4.9 billion to $5.1 billion. We expect adjusted operating income in the range of $800 million to $830 million and CapEx of $20 billion to $23 billion due to increased and accelerated investment in our platform to meet customer demand***. This FY 2025 guidance reflects the OpenAI contract we signed in March, the recent $4 billion expansion with the large AI enterprise, and the impact of Weights and Biases.

99. During the question-and-answer session of the 1Q 2025 Earnings Call, Defendant Intrator represented that the Company was focused on building infrastructure in order to meet customer demand, stating:

> With regards to the revenue beat, ***what you are seeing is a concerted strategic effort by the company to pull in the investment in the infrastructure to be able to build and scale and deliver compute more quickly to the client contracts that we have. And so, we've really made the focus on speed of delivery and quality of delivery to be a primary focus for the company***. And that beat was really attributed to our ability to drive that motion within our build delivery system.

***May 15, 2025 Form 10-Q***

100. The next day, the Company filed the 1Q 2025 Form 10-Q with the SEC, which was

signed by Defendants Intrator and Agrawal. The 1Q 2025 Form 10-Q also included certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Intrator and Agrawal attesting to the accuracy of the 1Q 2025 Form 10-Q and attesting that the 1Q 2025 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

101. The 1Q 2025 Form 10-Q attributed the Company's year-over-year increase in quarterly revenues to its purported "ability to rapidly scale" its operations, stating:

> Revenue for the three months ended March 31, 2025 increased by $793 million, or 420%, compared to the three months ended March 31, 2024. ***This substantial growth was related to increased demand from both existing and new customer contracts and our ability to rapidly scale our operations, emphasizing the strength of our customer relationships and our ability to meet the evolving needs of the industry.***

***July 7, 2025 Core Scientific Press Release***

102. On July 7, 2025, the Company issued the Core Scientific Acquisition Press Release. Defendant Intrator was quoted in the Core Scientific Acquisition Press Release as stating the following, in relevant part:

> Verticalizing the ownership of Core Scientific's high-performance data center infrastructure ***enables CoreWeave to significantly enhance operating efficiency and de-risk our future expansion, solidifying our growth trajectory***. Owning this foundational layer of our platform will enhance our performance and expertise as we continue helping customers unleash AI's full potential.

***August 12, 2025 Earnings Call***

103. On August 12, 2025, the Company held an earnings call to discuss its financial results for the second quarter of 2025 (the "2Q 2025 Earnings Call"). During the 2Q 2025 Earnings Call, Defendant Intrator touted CoreWeave's purported ability to scale its infrastructure, stating:

> Our ability to scale state-of-the-art infrastructure will further be bolstered by the more than $6 billion data center investment we've announced in Lancaster, Pennsylvania as well as a large data center project in Kenilworth, New Jersey, that we are co-developing via a joint venture with Blue AL. These new sites are perfect examples of our broader data center strategy, which allow us to provide a mix of both large-scale training and low-latency inference compute across the country.

104. Later during the 2Q 2025 Earnings Call, Defendant Intrator also stated the following, in relevant part:

> [I]n terms of the supply side, at the end of the day, right now, ***it's the powered shells that are the choke point that is causing the struggle to get enough infrastructure online for the demand signals that we are seeing***, not just within our company, it's the massive demand signals that you're seeing across the industry. And at the end of the day, what we are looking at, and I think what you're hearing across the board is that this is a structurally supply-constrained market. It is a market that is really working hard to try and balance and there are fundamental components at the powered shell, at the power in terms of the electrons moving through the grid, at the supply chains that exist within the GPUs, the supply chains that exist within the mid-voltage transformers. There's a lot of different pieces that are constrained. ***But ultimately, the piece that is the most significant challenge right now is accessing powered shells that are capable of delivering the scale of infrastructure that our clients are requiring.***

105. As a result of the alleged strong second quarter financial results, Defendant Agrawal announced the Company was raising full year guidance, "driven by strong demand." Specifically, Defendant Agrawal stated:

> ***For the second quarter in a row, we are raising our full year revenue guidance. For 2025, we now expect revenue in the range of $5.15 billion to $5.35 billion, a $250 million increase from our prior guidance of $4.9 billion to $5.1 billion, driven by continued strong customer demand.*** We expect adjusted operating income in the range of $800 million to $830 million, unchanged from our prior guidance as ***we remain cost disciplined while rapidly scaling our deployments at an unprecedented rate to end the year with over 900 megawatts of active power***. We expect CapEx in the range of $20 billion to $23 billion, unchanged from our prior guidance in the backdrop of continued strong customer demand. A significant portion of our full year CapEx will fall in Q4 due to the timing of go-live dates of our infrastructure.

***August 27, 2025 Deutsche Bank Technology Conference***

106. On August 27, 2025, Defendant Agrawal attended Deutsche Bank's 2025

Technology Conference on behalf of the Company. During his presentation, Defendant Argawal discussed the Company's challenges with meeting customer demand, stating:

> ***The demand remains relentless. And we're still in a chronically supply-constrained environment where capacity constraints, especially around powered shell capacity is the biggest constrained driver for our growth. We're still in an environment where demand outstrips supply . . . .***

***September 9, 2025 Goldman Sachs Conference***

107. On September 9, 2025, Defendants Intrator, Agrawal, and McBee attended the Goldman Sachs Communacopia + Technology Conference 2025 on behalf of the Company. During their presentation, Defendant McBee discussed CoreWeave's alleged high level of customer demand and the actions taken by the Company to meet such demand, stating:

> And Mike [Intrator] articulated this earlier, we've been consistent in this messaging of ***there is no ability to solve the demand profile that is in the market with the capacity that's available today, right? And capacity being powered shell data center infrastructure. That problem is continuing to persist and is honestly worsening***. I would say what we've observed over the past 4 to 6 weeks is yet another inflection in demand. And that demand is . . . it's [AI models that can execute] inference. . . . And what's interesting is it's not thousands or tens of thousands of GPUs. It's hundreds to millions of GPUs. It's at massive scale and at these volumes that no one ever anticipated before. ***So what is the demand climate today? I'd say it's as tight as it's ever been. There is no solution in sight to be able to bring enough infrastructure into the market to solve what it needs to continue scaling."***

108. The above statements in ¶¶ 94-107 were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company was having difficulties meeting demand as a result of weather and design-related headwinds; (2) CoreWeave was overly reliant on a single third-party data center supplier in order to meet customer demand; and (3) as a result of the difficulties meeting customer demand, it was unlikely that the Company would meet guidance provided to investors As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant

times.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

***October 30, 2025 Core Scientific Rejection of Acquisition***

109. The truth began to emerge on October 30, 2025, when Core Scientific announced that the acquisition by CoreWeave did not receive enough shareholder votes to approve of the merger agreement and, as a result, the merger agreement was terminated.

110. On this news, the price of the Company's stock fell $8.87 per share, or approximately 6.3%, from a closing price of $139.93 per share on October 29, 2025, to close at $131.06 per share on October 30, 2025. However, the Individual Defendants continued to obfuscate the truth regarding CoreWeave's ability to meet customer demand.

111. For example, on October 30, 2025, CoreWeave issued a press release titled "CoreWeave Comments on Core Scientific Vote" (the "CoreWeave Response Press Release"). The CoreWeave Response Press Release quoted Defendant Intrator as stating:

> We respect the views of Core Scientific stockholders and look forward to continuing our commercial partnership. ***CoreWeave's strategy remains unchanged***. We will continue to execute with discipline against our roadmap to create long-term shareholder value, including through opportunistic and strategic M&A.

112. The above statements in ¶111 were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company was having difficulties meeting demand as a result of weather and design-related headwinds; (2) CoreWeave was overly reliant on a single third-party data center supplier in order to meet customer demand; and (3) as a result of the difficulties meeting customer demand, it was unlikely that the Company would meet guidance provided to investors As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant

times.

***November 10, 2025 Financial Reports***

113. The truth continued to emerge on November 10, 2025, when the Company issued 3Q 2025 Earnings Press Release. The 3Q 2025 Earnings Press Release revealed that the Company was lowering 2025 full-year guidance for revenue, operating income, capital spending, and active power capacity.

114. On this news, the price of the Company's stock fell $17.22 per share, or approximately 16.3%, from a closing price of $105.61 per share on November 10, 2025, to close at $88.30 per share on November 11, 2025. However, the Individual Defendants continued to obfuscate the truth regarding the Company's ability to meet customer demand.

115. For example, during the 3Q 2025 Earnings Call, Defendant Intrator stated that the previously issued guidance was "affected by temporary delays related to a third-party data center developer":

> While we are experiencing relentless demand for our platform, data center developers across the industry are also enduring unprecedented pressure across supply chains. ***In our case, we are affected by temporary delays related to a third-party data center developer who is behind schedule. This impacts fourth quarter expectations***, which Nitin will discuss shortly.
>
> Having said that, the customer affected by the current delays has agreed to adjust the delivery schedule and extend the expiration date. As a result, we maintain the total value of the original contract and the customer preserves their capacity for the full duration of the initial agreement, demonstrating the confidence they have in our ability to provide the most performant solutions in market.

116. Later during the 3Q 2025 Earnings Call, Defendant Agrawal elaborated on the delays impacting CoreWeave's 2025 guidance, stating:

> As mentioned, ***the delays in powered-shell delivery associated with the data center provider will have an impact on our fourth quarter results. These delays are temporary, and as Mike noted, the affected customer has agreed to adjust the delivery schedule to preserve their capacity for the full duration and the total***

> ***value of the original agreement.***
>
> ***With that backdrop, we now expect 2025 revenue in the range of $5.05 billion to $5.15 billion. In addition, we anticipate 2025 adjusted operating income between $690 million to $720 million . . . .***

117. During the question-and-answer session of the 3Q 2025 Earnings Call, Defendant Intrator emphasized that the delays were with one data center customer, stating:

> ***There was a problem at one data center that's impacting us.*** But there are 32 data centers in our portfolio, all of them are progressing to one extent or another. And so that is -- each one of those is independent. . . . ***This one data center will catch up and then we will move forward from there.***

118. Defendant Agrawal further stated that the delays impacting guidance were impacting a "single provider—data center provider."

***November 11, 2025 CNBC Interview***

119. On November 11, 2025, Defendant Intrator appeared on CNBC's "Squawk on the Street," hosted by Jim Cramer (the "CNBC Interview"), which was later published in an article titled "CoreWeave CEO Won't Say if Core Scientific Caused Data Center Delays, Both Stocks Plunge."

120. During the CBNC Interview, Defendant Intrator downplayed the data center customer delays' impact on CoreWeave's financial performance in the third quarter, stating:

> I am proud all the things we accomplished this quarter. ***I am proud of the infrastructure that we brought online***. I am proud of the incredible progress we've made within our software. I am proud that we were once again identified as the singular best solution to deliver artificial intelligence to consumers. ***I am proud of our backlog build.***

121. Later during the CBNBC Interview, Defendant Intrator continued to emphasize that the delays were only impacting one data center. In relevant part, he stated, "Quite frankly, every single part of this quarter went exactly as we planned, except for one delay at a singular ***data center***" before clarifying that the delay was from a "a singular data center ***provider***," after

pushback from "Squawk on the Street" host, John Cramer.

122. Defendant Intrator further downplayed the impact of the delays from the data center provider, stating:

> ***You're going to see the infrastructure that was scheduled to be brought on in Q4 coming online in Q1, almost entirely, there'll be some that kind of comes on in Q2.*** You know, you're building massive scale infrastructure. It's very physical, it's very large, it requires coordination across all of the trades, physical construction, and ***there is a delay that hit, this delay will clear itself and the infrastructure will be brought online.***

123. The above statements in ¶¶115-122 were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Company was having difficulties meeting demand as a result of weather and design-related headwinds; (2) CoreWeave was overly reliant on a single third-party data center supplier in order to meet customer demand; and (3) as a result of the difficulties meeting customer demand, it was unlikely that the Company would meet guidance provided to investors As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**THE TRUTH FULLY EMERGES**

124. The truth fully emerged on December 15, 2025, after market hours, when the Wall Street Journal Article was published revealing new details surrounding the delays from the data center provider. The Wall Street Journal Article revealed that "heavy rains and winds caused a roughly 60-day delay at a construction site in Denton, a small city north of Dallas, preventing contractors from pouring concrete for a major AI data-center complex . . . ." Additionally, the Wall Street Journal Article stated that CoreWeave had intended to lease a "huge data-center cluster" to OpenAI, but that the "completion date" for the project "has been pushed back several months." Further, the Wall Street Journal Article revealed that Core Scientific had "flagged weather-related

delays in August" to CoreWeave regarding the Denton facility.

125. The Wall Street Journal Article also discussed some delays at the data centers were not just weather related, as "***[t]here were additional delays caused by revisions to design plans for some of the data centers a partner is building for CoreWeave in Texas and elsewhere, according to filings***." Like the weather-related delays, the Wall Street Journal Article revealed that: "***Core Scientific has been flagging delays to its collaborations with CoreWeave since at least February, when it reported that it had pushed back certain construction timelines in order to make design enhancements to further optimize GPU performance***."

126. On this news, the price of the Company's stock fell $2.85 per share, or approximately 3.4%, from a closing price of $72.35 per share on December 15, 2025, to close at $69.50 per share on December 16, 2025.

## DAMAGES TO COREWEAVE

127. As a direct and proximate result of the Individual Defendants' misconduct, CoreWeave has lost and will continue to lose and expend many millions of dollars.

128. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

129. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

130. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken

against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

131. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

132. As a direct and proximate result of the Individual Defendants' conduct, CoreWeave has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

133. Plaintiff brings this action derivatively and for the benefit of CoreWeave to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of CoreWeave, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b) and 21D of the Exchange Act.

134. CoreWeave is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

135. Plaintiff is, and has been at all relevant times, a shareholder of CoreWeave. Plaintiff will adequately and fairly represent the interests of CoreWeave in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

136. Plaintiff incorporates by reference and re-alleges each and every allegation stated

above as if fully set forth herein.

137. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, CoreWeave's Board consisted of the following six individuals: Defendants Intrator, Boone, Cogen, Hutchins, Venturo, and Whitman (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to three of the six Director-Defendants that were on the Board at the time this action was filed.

138. Demand is further excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders the Director-Defendants again unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

139. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

140. Additional reasons that demand on Defendant Intrator is futile follow. Defendant Intrator co-founded the Company and has served as the Company's Chairman and CEO since September 2017. The Company provides Defendant Intrator with his primary occupation, for which he receives handsome compensation. Thus, as the Company admits, he is not independent.

As the trusted, long-time Company CEO and as a director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Intrator also signed the false and misleading 1Q 2025 Form 10-Q. Further, Defendant Intrator's insider sales, made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the scheme. Moreover, Defendant Intrator is named as a defendant in the Securities Class Action. For these reasons too, Defendant Intrator breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141. Additional reasons that demand on Defendant Boone is futile follow. Defendant Boone has served as a Company director since January 2025. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Boone has received and continues to receive handsome compensation for her role as a director. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Boone breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

142. Additional reasons that demand on Defendant Cogen is futile follow. Defendant Cogen has served as Company director since September 2017. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Defendant Cogen has received and continues to receive handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Cogen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143. Additional reasons that demand on Defendant Hutchins is futile follow. Defendant Hutchins has served as the Company's Lead Independent Director since February 2025. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Hutchins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144. Additional reasons that demand on Defendant Venturo is futile follow. Defendant Venturo co-founded the Company and has served as a Company director and as its CSO since March 2024. He also previously served as the Company's CTO. The Company provides Defendant Venturo with his primary occupation, for which he receives handsome compensation. Thus, as the

Company admits, he is not independent. As a trusted, long-time Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Venturo's insider sales, made while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, further demonstrate his motive in facilitating and participating in the scheme. For these reasons too, Defendant Venturo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145. Additional reasons that demand on Defendant Whitman is futile follow. Defendant Whitman has served as a Company director since March 2025. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Whitman has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Whitman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

146. Additional reasons that demand on the Board is futile follow.

147. Defendants Boone (as Chair), Cogen, and Whitman (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and

accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

148. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and waste of corporate assets. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

149. CoreWeave has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to

attempt to recover for CoreWeave any part of the damages CoreWeave suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

150. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

151. The acts complained of herein constitute violations of fiduciary duties owed by CoreWeave's officers and directors, and these acts are incapable of ratification.

152. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of CoreWeave. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of CoreWeave, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

153. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause CoreWeave to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

154. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

155. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CoreWeave's business and affairs.

157. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

158. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of CoreWeave.

159. In breach of their fiduciary duties owed to CoreWeave, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was having

difficulties meeting demand as a result of weather and design-related headwinds; (2) CoreWeave was overly reliant on a single third-party data center supplier in order to meet customer demand; and (3) as a result of the difficulties meeting customer demand, it was unlikely that the Company would meet guidance provided to investors. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

160. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

161. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

162. In yet further breach of their fiduciary duties, while the Company's stock price was trading at artificially inflated prices, Defendants Intrator, Agrawal, McBee, and Venturo engaged in improper insider sales, netting combined total proceeds of ***approximately $381.3 million***.

163. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of CoreWeave's securities. The Individual Defendants, in good faith, should have taken appropriate

action to correct the scheme alleged herein and to prevent it from continuing to occur.

164. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

165. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CoreWeave has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

166. Plaintiff, on behalf of CoreWeave, has no adequate remedy at law.

## SECOND CLAIM
## Against the Individual Defendants for Unjust Enrichment

167. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, CoreWeave.

169. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from CoreWeave that was tied to the performance or artificially inflated valuation of CoreWeave, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

170. Plaintiff, as a shareholder and a representative of CoreWeave, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

171. Plaintiff, on behalf of CoreWeave, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Abuse of Control**

172. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

173. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CoreWeave, for which they are legally responsible.

174. As a direct and proximate result of the Individual Defendants' abuse of control, CoreWeave has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, CoreWeave has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

175. Plaintiff, on behalf of CoreWeave, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

176. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CoreWeave in a manner consistent with the operations of a publicly held corporation.

178. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, CoreWeave has sustained and will continue to sustain significant damages.

179. As a result of the misconduct and breaches of duty alleged herein, the Individual

Defendants are liable to the Company.

180. Plaintiff, on behalf of CoreWeave, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

181. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

183. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused CoreWeave to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

184. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

185. Plaintiff, on behalf of CoreWeave, has no adequate remedy at law.

**SIXTH CLAIM**
**Against Defendants Intrator, Agrawal, and McBee for Contribution Under Sections 10(b) and 21D of the Exchange Act**

186. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

187. CoreWeave and Defendants Intrator, Agrawal, and McBee are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the

federal securities laws, the Company's liability will be in whole or in part due to Defendants Intrator's, Defendant's Agrawal's, and Defendant McBee's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

188. Defendants Intrator, Agrawal, and McBee, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

189. Accordingly, Defendants Intrator, Agrawal, and McBee are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

190. As such, CoreWeave is entitled to receive all appropriate contribution or indemnification from Defendants Intrator, Agrawal, and McBee.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of CoreWeave, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to CoreWeave;

(c) Determining and awarding to CoreWeave the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing CoreWeave and the Individual Defendants to take all necessary

actions to reform and improve CoreWeave's corporate governance and internal procedures to comply with applicable laws and to protect CoreWeave and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of CoreWeave to nominate at least three candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding CoreWeave restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: February 10, 2026

**THE BROWN LAW FIRM, P.C.**

*/s/ Elizabeth J. Donohoe*

Elizabeth J. Donohoe
Zachary M. Benson
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
zbenson@thebrownlawfirm.net
tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, Taruna Roy, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9 day of February, 2026.

Signed by:
Taruna Roy
FC9DD5E8AC19481...
Taruna Roy